IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANITA S.,[1] ) | |
| ) | |
| Plaintiff, ) | No. 22 C 034 |
| ) | |
| v. ) | Magistrate Judge Jeffrey Cole |
| ) | |
| KILOLO KIJAKAZI, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff applied for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§416(i), 423, over three years ago in August of 2019. (Administrative Record (R.) 176-182). She claimed that she became disabled as of July 20, 2014, due to left shoulder and left knee impairments. (R. 176, 201). She later amended that date to January 5, 2018. (R. 38). Over the next two years, the plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. Plaintiff filed suit under 42 U.S.C. § 405(g) on January 4, 2022, and the parties consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c) on January 12, 2022. [Dkt. #10]. It is the ALJ's decision that is before the court for review. *See* 20 C.F.R. §§404.955; 404.981. Plaintiff asks the court to remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

## I.

### A.

The plaintiff was born on January 14, 1965, making her fifty-three years old at the time she claims she became disabled and fifty-six at the time of the ALJ's decision. (176, 35-49). She has a solid work history, working steadily from 1996 through 2015. (R. 190-91). She was a hotel housekeeper, which kept her on her feet most of every day and required lifting up to fifty pounds and kneeling, crouching, and crawling throughout the day. (R. 209-13). But she injured her shoulder and developed arthritis in her knee, and could not handle that kind of work anymore. (R. 66-67). She tried returning to work again in 2019, but was unable to manage it due to pain from her injuries (R. 216).

Plaintiff – who is left-handed (R. 303) – tore the rotator cuff in her left shoulder at work in July 2014. (R. 172). She initially tried physical therapy and injections, but they didn't relieve her pain. (R. 303). She opted for surgical repair in 2016, but issues with her shoulder continued. On May 8, 2017, a left shoulder MRI showed post surgical changes compatible with rotator cuff surgical repair; tiny articular surface tear at junction of supra- and infra-spinatus tendons; mild supra- and infra-spinatus tendinosis; mild infra spinatus muscle atrophy; mild fraying of the superior labrum; mild subacromial subdeltoid bursitis; mild osteoarthritic changes of the acromioclavicular joint. (R. 272).

Old knee issues began to get worse as well. Plaintiff fell at work back around 2010, injuring her right knee. Then she fell again years later. On July 12, 2019, she sought treatment for pain around the kneecap. Upon examination, there was tenderness to palpation, range of motion painful at extremes, guarding with McMurry's maneuver, weight reduction recommended, and non-steroidal

anti-inflammatories. (R. 278). Right knee x-ray revealed moderate tricompartmental osteoarthritis and perhaps underlying loose bodies. (R. 31, 318).

On January 5, 2020, plaintiff had a consultative exam with Dr. Liana Palacci in connection with her application for benefits. The doctor noted she was 5'5", 205 pounds and wearing a knee brace. (R. 304). There was tenderness to palpation of the left anterior and posterior shoulder, although range of motion was normal. Strength was 4+/5, grip strength 5/5. There was tenderness to palpation along the right anterior and medial knee joint line, as well as right knee crepitus. Range of motion in the right knee was 110/150 flexion, left knee 130/150 flexion. Right lower extremity strength was 4+/5 (R. 305) Dr. Palacci said plaintiff was able to walk more than 50 feet without an assistive device and was able to handle objects, lift, and carry. (R]. 306).

An October 27, 2020 right knee radiograph showed mild medial joint space narrowing with small medial marginal osteophytes. (R. 33, 326). On November 30, 2020, a right knee MRI showed small effusion; moderate patellofemoral chondromalacia and severe medial compartment chondromalacia with joint space narrowing, subchondral cystic changes, subchondral marrow edema, and tricompartmental marginal osteophytes consistent with osteoarthritic changes; trace fluid consistent with bursitis at the inside of the knee; a medial meniscus tear; and mild superficial and deep bursitis below the kneecap. (R. 26, 332-33). That same day, an MRI of the left shoulder showed mild thickening and increased signal in the supraspinatus tendon consistent with tendinopathy; trace joint effusion; subacromial-aubdeltoid and subcoracoid bursitis; mild biceps tenoeynovitis; signs consistent with chronic subscapularis tendinopathy and a possible post-surgical tear. (R. 28, 334-35).

On April 2, 2021, plaintiff was suffering left shoulder pain and right knee pain. X-rays of the right knee showed moderate to severe medial joint space degeneration. The doctor noted that an October MRI showed tendinopathy of the supraspinatus tendon but that previous x-rays were normal. Left shoulder forward flexion was 170/175 and external rotation was just 25/35. There was right knee tenderness. Extension was full, but extension was decreased. (R. 23). She had a shoulder injection. (R. 24).

### B.

After an administrative hearing at which plaintiff, represented by counsel testified, along with a vocational expert, the ALJ determined the plaintiff had the following severe impairments: left shoulder, status post rotator cuff repair with osteoarthritis; osteoarthritis, right knee; and obesity. (R. 40). The ALJ then found plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 40).

The ALJ then determined that plaintiff could perform light work with the following additional limitations:

> occasionally climb ladders, ropes, scaffold, stairs or ramps and kneel and crawl. She can frequently stoop and crouch. The plaintiff can frequently reach in front, laterally and overhead with the left upper extremity.

(R. 41). The ALJ then briefly summarized the plaintiff's allegations and determined that her "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. (R. 42). The ALJ then discussed the medical

record. The ALJ discussed the plaintiff's left rotator cuff tear, subsequent surgery, and an MRI thereafter which showed "a possible post-surgical rotator cuff tear, bursitis, mild tenosynovitis, and a trace joint effusion." (R. 42). The ALJ turned to plaintiff's knee impairment, noting "painful range of motion at the extremes, tenderness to palpation over the medial joint line, and some guarding with McMurry's testing." (R. 43). The ALJ noted that x-rays showed "mild degenerative changes" (R. 43), and that a November 30, 2020 MRI showed "showed a meniscus tear, bursitis, trace fluid, a small effusion, and moderate patellofemoral and severe medial compartment chondromalacia with joint space narrowing." (R. 42). The ALJ noted that a January 3, 2020 consultative examination with Dr. Liana Palacci showed tenderness to palpation of her right knee, crepitus and reduced range of motion, and reduced strength. There was left shoulder tenderness and reduced strength, but full range of motion. (R. 43).

The ALJ thought that Dr. Palacci's opinion that plaintiff could "perform work activity" was consistent with the record. (R. 43). She found the opinions from the agency reviewing physicians that plaintiff could lift in the front, overhead or laterally frequently, but could not balance without restriction, "persuasive in part." The ALJ said additional evidence such as the November 30, 2020 MRI supported a finding that the plaintiff was limited to occasional climbing, kneeling and crawling. (R. 44). The ALJ then relied on the testimony of the vocational expert to find that the plaintiff could perform her past relevant work as a hotel housekeeper as she actually performed it and as it is generally performed. (R. 44). Accordingly, the ALJ found the plaintiff not disabled and not entitled to benefits under the Act. (R. 44-45).

## II.

The court's review of an ALJ's decision is "extremely limited." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022). If the ALJ's decision is supported by "substantial evidence," the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). The "substantial evidence" standard is not a high hurdle to negotiate. *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019); *Durham v. Kijakazi*, 53 F.4th 1089 (7th Cir. 2022). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). To determine whether "substantial evidence" exists, the court reviews the record as a whole, but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving debatable evidentiary conflicts, or determining credibility. *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022); *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). Where reasonable minds could differ on the weight of evidence, the court defers to the ALJ. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020).

But, in the Seventh Circuit, the ALJ also has an obligation to build what is called an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). The Seventh Circuit has explained that, even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that logical bridge. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.

1996)("... we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *see also Jarnutowski*, 48 F.4th at 774 ("... the Commissioner argues, we should affirm the ALJ's decision because it was supported by the evidence. Possibly. But we cannot reach that conclusion from the ALJ's analysis."); *but see, e.g., Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record,...."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on the causation element between the parties,...No matter, because we may affirm on any basis that appears in the record.").

      Of course, this is a subjective standard, and a lack of predictability comes with it for ALJs hoping to write opinions that stand up to judicial review. One reviewer might see an expanse of deep water that can only be traversed by an engineering marvel like the Mackinac Bridge. Another might see a trickle of a creek they can hop across with barely a splash. But, the Seventh Circuit has also called this requirement "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). All ALJs really need to do is "minimally articulate" their reasoning. *Grotts v. Kijakazi*, 27 F.4th 1273, 1276 (7th Cir. 2022); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016). "If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough."

*Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985).[2]

In this instance, the ALJ has not provided enough of a bridge to take the court from the medical evidence to his conclusion.

### III.

As just discussed, "logical bridges" are not "one-size-fits-all." Some reviewers need more explanation than others, and each reviewer in federal court is reviewing the ALJ's decisions *de novo*.

---

[2] Prior to *Sarchet*'s "logical bridge" language, the court generally employed the phrase "minimal articulation" in describing an ALJ's responsibility to address evidence. *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985)(collecting cases). The court's focus was on whether an ALJ's opinion assured the reviewing court that he or she had considered all significant evidence of disability. In *Zblewski v. Schweiker*, 732 F.2d 75 (7th Cir. 1984), for example, the court "emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and evidence submitted" but only "a minimal level of articulation of the ALJ's assessment of the evidence...in cases in which considerable evidence is presented to counter the agency's position." *Zblewski*, 732 F.2d at 79.

In *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985), the court rejected a plaintiff's argument that an ALJ failed to adequately discuss his complaints of pain and was more explicit about how far ALJs had to go to explain their conclusions:

> We do not have the fetish about findings that [the plaintff] attributes to us. The court review judgments, not opinions. The statute requires us to review the quality of the evidence, which must be "substantial," not the quality of the ALJ's literary skills. The ALJs work under great burdens. Their supervisors urge them to work quickly. When they slow down to write better opinions, that holds up the queue and prevents deserving people from receiving benefits. When they process cases quickly, they necessarily take less time on opinions. When a court remands a case with an order to write a better opinion, it clogs the queue in two ways—first because the new hearing on remand takes time, second because it sends the signal that ALJs should write more in each case (and thus hear fewer cases).
> The ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the statute requires him to do....This court insists that the finder of fact explain why he rejects uncontradicted evidence. One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant. That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits.

*Stephens*, 766 F.2d at 287 (citations omitted). Much more recently, the Seventh Circuit explained that "the 'logical bridge' language in our caselaw is descriptive but does not alter the applicable substantial-evidence standard." *Brumbaugh v. Saul*, 850 F. App'x 973, 977 (7th Cir. 2021).

8

So, for example, in a recent Seventh Circuit opinion, two judges on the panel needed more from an ALJ, while the third judge on the panel, who dissented, thought the ALJ's explanation of her reasoning was adequate. *See Jarnutowski v. Kijakazi*, 48 F.4th 769 (7th Cir. 2022). And, the Magistrate Judge who reviewed the ALJ's opinion below was able to follow the ALJ's reasoning as well. *See Donna J. v. Saul*, No. 19 C 2957, 2021 WL 2206160, at *1 (N.D. Ill. June 1, 2021). In terms of what constitutes an adequate "logical bridge," every *de novo* reviewer is different. And every medical record is different. Some depict young people, unfamiliar with the demands of work, who are troubled by no more than a couple of mild impairments. Records like those allow a court, without much hand-holding, to follow the reasoning of an ALJ who finds such an individual able to work on a daily basis. In those cases, there is not much of a "bridge" needed to make it from one side to the other, and review is not difficult. Again, it's not a one-size-fits-all proposition.

This case depicts a 56-year-old woman with an excellent work record. She had cleaned hotel rooms for two decades before physical labor gave her issues with her shoulder and her knee. She tore the rotator cuff in her dominant arm doing her cleaning work and, despite surgery, was left with a constellation of problems in that joint: tiny articular surface tear at junction of supra- and infra-spinatus tendons; mild supra- and infra-spinatus tendinosis; mild infra spinatus muscle atrophy; mild fraying of the superior labrum; mild subacromial subdeltoid bursitis; mild osteoarthritic changes of the acromioclavicular joint (R. 272), mild thickening and increased signal in the supraspinatus tendon consistent with tendinopathy and possible tear; trace joint effusion; subacromial-aubdeltoid and subcoracoid bursitis; mild biceps tenoeynovitis; and chronic subscapularis tendinopathy. (R. 28, 334-35). A right knee injury on the job resulted in a similarly long list of problems: a medial meniscus tear; small effusion; moderate patellofemoral chondromalacia and severe medial

compartment chondromalacia with joint space narrowing, subchondral cystic changes, subchondral marrow edema, and tricompartmental marginal osteophytes consistent with osteoarthritic changes; trace fluid consistent with bursitis at the inside of the knee; mild superficial and deep bursitis below the kneecap (R. 26, 332-33), and moderate to severe medial joint space degeneration. (R. 23). Adding to those knee issues is the fact that the plaintiff, as the ALJ found, is obese, with a BMI of 34.

From there, without a very well-engineered "logical bridge," – and one more sturdy than we have here – it's difficult to get to the ALJ's finding that plaintiff can go back to being on her feet all day cleaning hotel rooms. That conclusion is not self-evident or obvious; it certainly doesn't just flow from the medical evidence regarding plaintiff's severe shoulder and knee impairments. From that evidence, it's difficult to get to the ALJ's finding that plaintiff's knee and shoulder can handle scrubbing tubs and toilets, washing bathroom floors, pushing a vacuum, changing bedding and perhaps flipping mattresses, etc., in room after room, day after day. And it is very difficult to get from the evidence to the ALJ's finding that plaintiff can climb ladders, ropes, scaffold, stairs or ramps and kneel and crawl occasionally, meaning from very little to up to one-third of every workday. SSR 83-10, 1983 WL 31251, at *5. Consider a very sore shoulder and a very painful knee and imagine climbing a ladder or a rope even once a day, let alone perhaps two hours a day. Consider that very painful knee and imagine kneeling or crawling on it at work every day.

The ALJ also thought the plaintiff could stoop and crouch frequently, or from one third to two thirds of every day. SSR 83-10 (S.S.A. 1983), 1983 WL 31251, at *6. Think of stooping and crouching– bending that knee – for two to five hours every day. Now think of someone doing all that who is 55 and obese. Obviously, obesity adversely affects the problems in the plaintiff's knee.

And it would impinge on standing and walking, let alone crouching, stooping, and climbing. It would also make it harder to use a bad shoulder to climb ladders and ropes. *See Allensworth v. Colvin*, 814 F.3d 831, 833 (7th Cir. 2016)(ALJ failed to consider how plaintiff's obesity could aggravate his back, knee and OSA [obstructive sleep apnea] impairments); *Browning v. Colvin*, 766 F.3d 702, 707 (7th Cir. 2014)(obesity and a painful, malfunctioning hip and knee); *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004)("A great many people who are not grossly obese and do not have arthritic knees find it distinctly uncomfortable to stand for two hours at a time.").

Reviewing courts are supposed to apply a common-sense reading to the entirety of an ALJ's decision. *Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). They "need not check.... common sense at the door." *Gil v. Reed*, 381 F.3d 649, 662 (7th Cir. 2004). Nor should they in any case. *United States v. Montoya de Hernandez*, 473 U.S. 531, 542 (1985). That, of course, can cut both ways. At best, the ALJ's residual functional capacity finding strains common sense. At worst, it puts one in mind of what the Seventh Circuit said when confronted with a similar residual functional capacity finding for an obese woman with degenerative disc disease:

> If we thought the Social Security Administration and its lawyers had a sense of humor, we would think it a joke for its lawyer to have said in its brief that the administrative law judge "accommodated [the plaintiff's] obesity by providing that she could never [be required as part of her work duties to] climb ladders, ropes, or scaffolds, and could only occasionally climb ramps or stairs, balance, kneel, crawl, stoop, and/or crouch." (The administrative law judge must have forgotten that the primary consulting physician thought the plaintiff can crawl and crouch at work.) Does the SSA think that if only the plaintiff were thin, she could climb ropes? And that at her present weight and with her present symptoms she can, even occasionally, crawl, stoop, and crouch?

*Goins v. Colvin*, 764 F.3d 677, 682 (7th Cir. 2014).

11

The explanation the ALJ gave for her conclusion was, essentially, that she didn't believe the plaintiff's pain was that bad. And her reasoning for that conclusion was sketchy at best. She said the plaintiff's complaints weren't entirely consistent with the medical evidence and other evidence in the record. (R. 42). She said "the preponderance of the evidence, including the treatment history, the clinical findings, the diagnostic test results, and the claimant's level of activities, is consistent with the conclusion that the [plaintiff] has work-related limitations, but retains the capacity for work with the restrictions in the above residual functional capacity finding." (R. 44). But those are conclusions – endpoints – that, as already explained, do not give the reviewer any idea of how the evidence leads to them.

An ALJ adequately supports an RFC determination when he or she "consider[s] all limitations supported by [the] record evidence" and "tie[s] the record evidence to the limitations included in the RFC finding." *Jozefyk v. Berryhill*, 923 F.3d 492, 497–98 (7th Cir. 2019). *Accord Winsted v. Berryhill*, 923 F.3d 472, 473 (7th Cir. 2019)(ALJ must adequately explain how limitations account for impairments shown by the medical evidence); *Britt v. Berryhill*, 889 F.3d 422, 426 (7th Cir. 2018)(". . . RFC assessments must explain why a reported limitation is or is not consistent with the evidence in the record."). Unfortunately, the ALJ simply did not do that here. For example, the clinical findings show, among other things, that the plaintiff has a torn meniscus along with moderate patellofemoral chondromalacia and severe medial compartment chondromalacia with joint space narrowing. How do those clinical findings show that the plaintiff can stoop, crouch, kneel, or crawl every day at work? It certainly isn't obvious, although given the lack of any explanation, the ALJ apparently thought it was. On remand, the ALJ will have to let everyone in on her thinking.

For similar reasons, the ALJ's rejection of plaintiff's allegations regarding the limitations stemming from her symptoms is flawed as well. The ALJ said that the plaintiff's "allegations of disabling symptoms and limitations [we]re not fully supported by the objective medical evidence of record . . . including the treatment history, the clinical findings, the diagnostic test results, and the claimant's level of activities . . . ." (R. 44). Again, the ALJ had to offer some explanation as to why objective evidence showing a medial meniscus tear; small effusion; moderate patellofemoral chondromalacia and severe medial compartment chondromalacia with joint space narrowing, subchondral cystic changes, subchondral marrow edema, and tricompartmental marginal osteophytes consistent with osteoarthritic changes; trace fluid consistent with bursitis at the inside of the knee; and moderate to severe medial joint space degeneration somehow undermine allegations of a limited ability to walk or stand. Unfortunately, the ALJ did not hint as to how her conclusion was supported by the evidence. But "[b]are conclusions are not a rationale." *Love v. Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 397 (7th Cir. 2009).

Similarly, some explanation was necessary as to why plaintiff's allegations of limitations lifting are undermined by objective evidence showing showed mild thickening and increased signal in the supraspinatus tendon consistent with tendinopathy; trace joint effusion; subacromial-aubdeltoid and subcoracoid bursitis; mild biceps tenoeynovitis; signs consistent with chronic subscapularis tendinopathy and a possible post-surgical tear in the left shoulder. While an ALJ's credibility determinations are given special deference, the ALJ must still "build an accurate and logical bridge between the evidence and the result." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir.2000). Here, the objective medical evidence seems to support the plaintiff's complaints rather than detract from them. Given that, the ALJ had to do more than just say it didn't. *See, e.g.,*

13

*Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006)(ALJ had to explain why plaintiff's complaints were inconsistent with the objective medical evidence). Again, it is simply not obvious or inevitable that someone with a documented meniscus tear along with a few other knee issues is lying when she says she is limited in her ability to stand or walk.

The ALJ also pointed to plaintiff's "level of activities" as undermining her allegations. (R. 44). But the only specific activity the ALJ mentioned was plaintiff being able to "climb six or seven stairs to get into her apartment." (R. 44). The gap between that "level of activit[y]" – especially considering plaintiff's testimony that she spent most of her time inside, watching her grandson, and "[didn't] really go out." (R. 69, 70) – and not believing that plaintiff's allegations is too large to be negotiated without a "logical bridge." Again, it's far from self-evident that someone who walks up a few stairs every two or three days is lying when they say their knee is so painful they are limited in standing and walking.

All this is not to say the plaintiff is disabled. Perhaps there is other work she can do. But at her age – which the Commissioner's regulations deem "advanced", 20 CFR § 404.1563(e) – the Commissioner's rules recognize that, if a plaintiff can't perform her past relevant work, adjustment to other work at a sedentary or light level might be too difficult. 20 C.F.R. § 404.1568(d)(4); *see also Dimmett v. Colvin*, 816 F.3d 486, 488 (7th Cir. 2016)("One might think that even though [s]he can't do medium work [s]he can do light or sedentary work. But h[er] age makes the distinction between medium and light work critical: a person of h[er] age who has no skills transferable to light or sedentary work is presumptively disabled."). That might be why the ALJ here was leaning toward a finding that plaintiff could go back to cleaning hotel rooms. But an ALJ can't just lean; and if she is leaning away from evidence that undermines her conclusion, she has to explain why.

14

## CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment [Dkt. #22] is denied, and this case is remanded to the Commissioner.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 1/9/23